68 F.3d 621
 1995 Copr.L.Dec. P 27,460, 36 U.S.P.Q.2d 1449
 Beebe BOURNE, d/b/a Bourne Co., Plaintiff-Appellant-Cross-Appellee,
v.
The WALT DISNEY COMPANY and Buena Vista Home Video,
Defendants-Appellees-Cross-Appellants,
Tower Records, Inc., Barnes & Noble Bookstores, Inc.,
Blockbuster Entertainment Corp., RKO Warner Video,
Inc. and John Does 1 through 100, Defendants.
 Nos. 1578, 1579, Dockets 94-7793, 94-7847.
 United States Court of Appeals,
Second Circuit.
 Argued June 29, 1995.
Decided Oct. 18, 1995.
 
 Stuart A. Summit (George Berger, Theodore C. Max, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, of counsel), for Plaintiff-Appellant-Cross-Appellee.
 Sanford M. Litvack (Jacob M. Yellin, The Walt Disney Company, Burbank, CA, Clark E. Walter, Joanna R. Swomley, Dewey Ballantine, New York City, of counsel), for Defendants-Appellees-Cross-Appellants.
 Stephen H. Sulmeyer, Santa Monica, CA, for Karen Adams and Gretchen Thomas Anderson as amici curiae.
 Alan L. Shulman, Scott L. Baker, Silverman & Shulman, P.C., New York City, of counsel, for National Music Publishers' Association, Inc. as amicus curiae.
 Fritz E. Attaway, Motion Picture Association of America, Inc., Washington, DC, Jon A. Baumgarten, Charles S. Sims, Proskauer Rose Goetz & Mendelsohn, New York City, of counsel, for The Motion Picture Association of America, Inc. as amicus curiae.
 Dixon Q. Dern, Warren D. Dern, Dern & Vein, Los Angeles, CA, of counsel, for Video Software Dealers Association as amicus curiae.
 Before: VAN GRAAFEILAND and MINER, Circuit Judges, and COTE, District Judge.*
 MINER, Circuit Judge:
 
 
 1
 Plaintiff-appellant-cross-appellee Beebe Bourne, doing business as the Bourne Co. ("Bourne"), brought this copyright infringement action against defendants-appellees-cross-appellants Walt Disney Co. and Buena Vista Home Video (collectively, "Disney").
 
 
 2
 Bourne's first claim of infringement arose from Disney's sale of videocassette recordings featuring Bourne's copyrighted compositions from the motion pictures "Snow White and the Seven Dwarfs" and "Pinocchio" ("the Compositions"). Although the Compositions were written by Disney employees, Disney had assigned the copyrights in the Compositions to Irving Berlin, Inc. ("Berlin"), a music publisher and the predecessor-in-interest to Bourne, in the 1930s when the movies first were released.
 
 
 3
 While conceding that the instrument conveying Disney's copyrights in the Pinocchio compositions to Bourne provided Disney with a license to use the compositions "in synchronism with any and all of the motion pictures which may be made by [Disney]," Bourne argued that these rights were insufficient to allow Disney to distribute the compositions on videocassette. With respect to the compositions from Snow White, Bourne argued that these copyrights were assigned to Bourne without the grant of a license to Disney allowing it to use the compositions. In Bourne's view, Disney had no right to use the compositions from Snow White until 1961, when Bourne conveyed certain rights to Disney in settlement of litigation then pending between the parties. The jury rejected each of Bourne's arguments.
 
 
 4
 Bourne's second copyright infringement claim related to Disney's use of the Compositions in television commercials. Bourne contended that the licenses granted to Disney did not provide Disney with the right to use the Compositions in these advertisements. The jury found in Bourne's favor on this claim. In so doing, the jury rejected Disney's argument that Bourne was estopped from asserting its interpretation of the license agreements. The parties stipulated to damages in the amount of $420,000.
 
 
 5
 On appeal, Bourne's principal contention is that the district court erred in failing to enter judgment as a matter of law in its favor on its claim regarding Disney's sale of videocassettes containing the Compositions. Bourne also argues that the district court improperly placed upon it the burden of proving that Disney's use of the Compositions was unauthorized. Finally, Bourne appeals from the district court's denial of certain ancillary relief in connection with its successful claim regarding the television advertisements. Disney cross-appeals, contending that the district court erred in failing to enter judgment as a matter of law in its favor on its defense of estoppel. Disney also takes issue with certain aspects of the district court's jury charge. For the reasons that follow, we reject each of these challenges and affirm the judgment of the district court in its entirety.
 
 BACKGROUND
 1. The Agreements
 
 6
 a. The 1933 "Shorts" Agreement
 
 
 7
 Since 1928, Disney has been in the business of creating animated motion pictures. These films include music, which is synchronized to the movement depicted in the drawings. During the 1930s, Disney was best known for creating six- to eight-minute animated motion pictures, called "short subjects" or "shorts," featuring such characters as Mickey and Minnie Mouse, Goofy, and Donald Duck. At that time, Disney had no means of commercially exploiting the music featured in its shorts. In order to generate additional revenue from its musical compositions, Disney entered into an agreement with Berlin, one of the largest music publishers at that time.
 
 
 8
 Pursuant to a 1933 agreement between Berlin and Disney ("the 1933 Shorts Agreement"), Disney assigned the copyrights in the "musical compositions written for and used in connection with the synchronized motion picture comic cartoons of [Disney]" in exchange for a share of the revenues received by Berlin for use of the music. In derogation of the broad language set forth in the preamble of the agreement, paragraph nine limited the scope of the agreement in the following manner:
 
 
 9
 [T]he motion picture comic cartoons contemplated herein shall be the remaining twenty-six (26) motion picture cartoons to be produced for the motion picture season of 1933-34, plus the following motion picture comic cartoons comprised within the series produced for the motion picture season of 1932-33: [listing titles of seven cartoons].
 
 
 10
 In order to allow Disney to use its musical compositions in connection with the animations for which they were written, paragraph two of the agreement granted back to Disney
 
 
 11
 the right to record ... such music, mechanically, and perform the license others to perform the same in connection with the respective motion picture for which such music was especially written, the right to record such music mechanically in any and all other motion pictures to be produced by [Disney], the right to ship, import and export ... any and all such mechanical recordings throughout the world, but only in connection with [Disney's] pictures. [Disney] reserves television rights in respect to its motion picture comic cartoons....
 
 
 12
 (emphasis added).
 
 
 13
 The 1933 Shorts Agreement was extended by the parties during the next several years. In 1935, the parties enlarged the subject matter of the agreement to include the musical compositions contained in 18 additional Mickey Mouse and Silly Symphony cartoons. In 1936, the scope of the 1933 agreement again was expanded, this time to include the musical compositions contained in a series of cartoons to be distributed under an agreement with RKO Radio Pictures, Inc. The 1936 agreement was supplemented by a letter agreement in 1939 to include the "music and compositions contained in [Disney's] short subject motion pictures for the ... 1937-38 and 1938-39" seasons.
 
 
 14
 b. Snow White and the 1937 Assignment Agreement
 
 
 15
 Disney's first feature-length film, Snow White, was exhibited in theaters beginning in December of 1937. Sometime before the movie's premiere, Disney assigned to Berlin the copyrights to eight musical compositions from Snow White. Pursuant to this agreement ("the 1937 Assignment Agreement"), Berlin agreed to pay Disney a share of the royalties that it received from licensees of these compositions. The printed-form agreement used to memorialize the copyright assignment did not reserve any rights to Disney, nor did it grant Disney a license to use the musical compositions in any manner. Notwithstanding this lack of an express license, Snow White was released in theaters on a number of occasions while the principals to the transaction still were alive, without complaint from Berlin or its successor, Bourne.
 
 
 16
 c. The 1939 Pinocchio Agreement
 
 
 17
 On August 15, 1939, Disney entered into a new and separate agreement with Berlin ("the 1939 Pinocchio Agreement"), assigning to Berlin the copyrights in (1) the compositions from Disney's full-length motion picture, Pinocchio, and (2) the short subjects comprising Disney's 1939-40 series, in exchange for certain royalties. This agreement specifically granted back to Disney
 
 
 18
 the non-exclusive right to mechanically and/or electrically record the said musical compositions ... in synchronism with any and all of the motion pictures which may be made by [Disney] and the right to export such recordings to all of the countries of the world, and the right to give public performances of such recordings in connection with the exhibition of the motion pictures with which said recordings were synchronized.
 
 
 19
 The parties agree that this agreement is fully integrated and is not dependent on any prior agreements.
 
 
 20
 d. The 1961 Settlement Agreement
 
 
 21
 In 1957, following the death of Saul Bourne, who was the owner of Bourne, Inc., Disney sued to recapture the copyrights in the Compositions, alleging that the copyrights were held in trust by Bourne on the condition that they would be assigned back to Disney upon demand. In its complaint, Disney described the 1933 Agreement as "relating to the music in certain short motion picture subjects;" the 1937 Assignment Agreement as the only agreement concerning Snow White; and the 1939 Pinocchio Agreement as the only contract concerning Pinocchio. The litigation was settled in 1961 by mutual agreement ("the 1961 Settlement Agreement"). Although the 1961 Settlement Agreement granted Disney a license in the theatrical motion picture and television grand performing rights in the Compositions, as defined by the American Society of Composers, Authors, and Publishers, nothing in the settlement agreement gave Disney the right to synchronize or fix the Compositions on videocassette.
 
 2. Disney's Use of the Compositions
 
 22
 a. In General
 
 
 23
 At trial, Disney introduced substantial evidence that it had used the Compositions for decades in a variety of ways, without complaint from Bourne. As noted above, Snow White was released in 1937 and re-released seven times thereafter. In connection with the re-releases of both Pinocchio and Snow White, Disney created theatrical trailers, using the Compositions, which were run as "coming attractions" in movie theaters. Disney also used the Compositions in connection with its weekly television show that began in 1954 and ran for almost four decades. In particular, the song "When You Wish Upon a Star" from Pinocchio was used as the standard opening and closing for the series. There also was evidence that Disney sold reel-to-reel movies containing the Compositions for home use.
 
 
 24
 b. Videocassettes
 
 
 25
 The first videocassette recording that Disney made and sold containing Bourne's copyrighted compositions was the subject of a 1979 license agreement between Bourne and Disney ("the 1979 Agreement"). Pursuant to this agreement, Disney received a license to manufacture and sell videocassette recordings of a live theatrical performance of the Snow White compositions held at Radio City Music Hall. Bourne received a 68 cent royalty for each videocassette sold.
 
 
 26
 In the early 1980s, Disney introduced videocassettes containing various animated pictures synchronized with Bourne's compositions. In 1985, Disney released the full-length motion picture Pinocchio on videocassette. Prior to this time, Disney had a policy of prohibiting the exploitation of its full-length feature films in media other than theatrically-exhibited film. Indeed, pursuant to Disney's policy, films such as Snow White and Pinocchio were exhibited in theaters every six to eight years. This policy was abandoned after a change in Disney's management in 1984. The Pinocchio videocassette remained on Billboard's list of top-selling videocassettes for almost three years.
 
 
 27
 Since the release of Pinocchio, Snow White also has been distributed on videocassette. Besides the release of Disney's feature films, the Compositions have been used by Disney in connection with "sing-along" programs and certain cartoons.
 
 
 28
 c. Advertising
 
 
 29
 Disney also has used the Compositions in paid television commercials to advertise its theme parks and the theatrical releases of Snow White and Pinocchio. Overall, Disney utilized such paid television advertising infrequently and on a regional, rather than a national, basis until the mid-1980s. On several occasions, Disney obtained licenses from Bourne for the use of the Compositions in its commercials. In 1975, Bourne issued a license to Disney for a television commercial using the song "When You Wish Upon a Star" to promote Disneyland. In 1977, Disney paid Bourne a fee to use one of its copyrighted compositions from Snow White in connection with a television advertisement for Disney World and Eastern Airlines. Again, in 1985, Disney obtained a license from Bourne for the use of the Compositions in its television commercials.
 
 
 30
 In the majority of instances, however, Disney has used the Compositions in its paid television advertisements without obtaining a license from Bourne. In January of 1987, Disney began its "What's Next" series, in which it used the song "When You Wish Upon a Star" in a national television campaign without a license from Bourne. Disney also used the Compositions in television commercials to promote the theatrical releases of Pinocchio in 1984 and Snow White in 1987, even though it had not obtained a license.
 
 3. Proceedings Below
 
 31
 Following an eleven-day trial,[1] the jury returned a verdict in favor of Bourne on its second claim, finding that Disney infringed Bourne's copyrights by using the Compositions in television advertising. On Bourne's first claim, concerning Disney's right to use the Compositions in videocassettes, the jury found for Disney. The parties stipulated to the sum of $420,000 in damages. The district court denied Bourne's post-trial motions for attorney's fees and a new trial on the basis of newly discovered evidence, and granted its motions for costs and prejudgment interest.
 
 DISCUSSION
 
 32
 1. Disney's Rights to Make and Sell Videocassettes
 
 
 33
 a. Disney's Rights in Snow White
 
 
 34
 Bourne argues that the district court erred in submitting to the jury the question of whether Disney has a license for the musical compositions from Snow White. Bourne bases this argument on its contentions that (1) Snow White clearly falls outside the scope of the 1933 Shorts Agreement, and (2) the 1937 Assignment Agreement, by which the copyrights in musical compositions from Snow White were assigned to Bourne, did not contain a provision granting rights back to Disney. Accordingly, Bourne argues that the district court erred in failing to enter judgment as a matter of law in its favor with regard to Snow White.
 
 
 35
 As to Bourne's first contention, we agree that the musical compositions from Snow White clearly fall outside the scope of the 1933 Shorts Agreement. In arguing that the agreement was ambiguous, Disney points to the broad language of the preamble of the 1933 Agreement, which states: "[Bourne] desires to acquire the copyrights for the musical compositions written for and used in connection with the synchronized motion picture comic cartoons of [Disney]." Disney reasons that, since Snow White is a "motion picture comic cartoon," the agreement could be read to include the Snow White compositions. We disagree.
 
 
 36
 Disney's construction of the preamble is belied by paragraph nine of the agreement, which provides:
 
 
 37
 [T]he motion picture comic cartoons contemplated herein shall be the remaining twenty-six (26) motion picture cartoons to be produced for the motion picture season of 1933-34, plus the following motion picture comic cartoons comprised within the series produced for the motion picture season of 1932-33: [listing titles of seven cartoons].
 
 
 38
 Snow White's compositions clearly fall outside the scope of paragraph nine. Reading the contract as a whole, as we must, see Kinek v. Paramount Communications, Inc., 22 F.3d 503, 509 (2d Cir.1994), we conclude that Disney's reliance on the preamble is misplaced. Moreover, Disney's construction of the agreement is contradicted by the parties' subsequent agreements in 1935, 1936, and 1939, in which the parties enlarged "the subject matter" of the 1933 Shorts Agreement by adding certain motion picture comic cartoons "in addition to those set forth in paragraph '9' of the [prior] contract." Accordingly, we conclude that the Snow White compositions fall outside the scope of the 1933 Shorts Agreement.
 
 
 39
 However, our examination of the 1937 Assignment Agreement persuades us that it was not intended to be a complete integration of the mutual promises between Disney and Bourne, and, therefore, that extrinsic evidence of the implied grant of a license to Disney properly was admitted. Under New York law, where, as here, the written agreement does not contain a merger clause, the court must determine whether the agreement is integrated "by reading the writing in the light of surrounding circumstances, and by determining whether or not the agreement was one which the parties would ordinarily be expected to embody in the writing." Braten v. Bankers Trust Co., 60 N.Y.2d 155, 468 N.Y.S.2d 861, 864, 456 N.E.2d 802, 804 (1983) (quoting Ball v. Grady, 267 N.Y. 470, 472, 196 N.E. 402 (1935)). The "[d]ecision in each case must, of course, turn upon the type of transaction involved, the scope of the written contract" and the content of any other agreements asserted. Fogelson v. Rackfay Constr. Co., 300 N.Y. 334, 338, 90 N.E.2d 881 (1950).
 
 
 40
 We believe that the circumstances surrounding the 1937 Assignment Agreement compel the conclusion that the agreement was not intended to be an integration. If, as Bourne contends, the 1937 Assignment Agreement was intended to constitute the entire agreement concerning the musical compositions from Snow White, then Disney would have been left with no right to use the compositions in the original release of the motion picture in 1937 or in any of the subsequent releases. That Disney would relinquish, on the eve of Snow White's theatrical release, all rights in the compositions that it composed specifically for use in the motion picture is highly implausible.
 
 
 41
 Other factors also weigh against finding that the agreement was intended to be an integration. First, for Disney not to have received a grant-back from Bourne would have marked a considerable departure from the prior business relationship between the companies. The prior agreements between the parties demonstrate that Disney, a motion picture producer, turned to Bourne, a music publisher, to exploit commercially the musical compositions that Disney created in connection with its motion pictures. In each instance, Disney retained certain rights in the compositions so as to allow Disney to continue to put them to the use for which they originally were written. Indeed, the use of the Compositions by Disney in connection with its motion pictures was essential to the purpose of the agreements, since Bourne's ability to exploit successfully the Compositions depended, in large part, on the success of Disney's motion pictures. See Saxon Capital Corp. v. Wilvin Assocs., 195 A.D.2d 429, 600 N.Y.S.2d 708, 709 (1st Dep't 1993) ("[T]he condition [absent from the writing] was so central to the purpose of the [agreement] that the condition might well have been perceived by defendants as self-evident and its omission unremarkable.").
 
 
 42
 The parties' conduct subsequent to the agreement also weighs against finding that the 1937 Assignment Agreement was intended to be an integration. Berlin and its successor, Bourne, certainly were aware of Snow White's successful theatrical releases. Yet, Bourne never contended, until this litigation, that Disney did not have the right to use the musical compositions written for Snow White in synchronization with the motion picture. Finally, we note that the 1937 Assignment Agreement was a printed-form contract, prepared by Bourne, and apparently signed without extensive negotiations or the involvement of legal counsel. Cf. Braten, 468 N.Y.S.2d at 864, 456 N.E.2d at 804 (in concluding that the contract was a complete integration, the court relied on the fact that "[t]he parties and their counsel negotiated during a two-month period, resulting in a specially drawn document"). Based on the foregoing considerations, we are confident that a New York court would conclude that the 1937 Assignment Agreement was not intended to be a complete integration. See Saxon, 600 N.Y.S.2d at 709. Accordingly, extrinsic evidence properly was admitted to prove that the parties intended to grant back to Disney certain rights in the Snow White compositions.
 
 
 43
 Although there was little direct evidence of the specific terms of the grant-back, we believe that Disney presented persuasive evidence that the contracting parties intended the grant-back provisions set forth in the 1933 Shorts Agreement to govern Disney's rights to the Snow White compositions. The 1933 Shorts Agreement, which had been expanded in 1935 and 1936, was the only written agreement between the parties that delineated Disney's rights in musical compositions that it had turned over to Bourne to exploit. Furthermore, correspondence between the parties indicates that the compositions from Snow White were being delivered to Bourne "for the usual purpose," evincing an intent to have the matter controlled by a framework already established by the parties. Therefore, the evidence demonstrates an implied understanding between Disney and Bourne that Disney's rights to the Snow White compositions were to be controlled by the 1933 Shorts Agreement. Accordingly, we conclude that, while the compositions from Snow White do not fall explicitly within the scope of the 1933 Shorts Agreement, the jury reasonably could have found that the parties implicitly incorporated the grant-back provision of the 1933 Shorts Agreement into the 1937 Assignment Agreement. Therefore, the district court did not err in submitting this matter to the jury.
 
 
 44
 b. Disney's Rights to Produce Videocassettes
 
 
 45
 Bourne argues that the district court also erred by submitting to the jury the question of whether the 1933 Shorts Agreement and the 1939 Pinocchio Agreement provided Disney with a license to synchronize the Compositions with its videocassette images ("videocassette rights"). Bourne contends that videocassette rights fall outside the specific language of the grant, and that, because videocassette technology was unknown at the time of the agreements, such rights could not have been within the contemplation of the parties.
 
 
 46
 The relevant principles of contract construction are well-established. The primary objective "is to give effect to the intent of the [contracting] parties as revealed by the language they chose to use." Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir.1992). If the language of the contract is "unambiguous and conveys a definite meaning," then the interpretation of the contract is a question of law for the court. Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan, 7 F.3d 1091, 1094 (2d Cir.1993); see Seiden, 959 F.2d at 428 (contract language "is not ambiguous when it has a definite and precise meaning ... concerning which there is no reasonable basis for a difference in opinion" (internal quotations omitted)). Alternatively, "[w]here the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another," then the interpretation of the contract becomes a question of fact for the jury and extrinsic evidence of the parties' intent properly is admissible. Seiden, 959 F.2d at 428; see Walk-In Medical Ctrs., Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir.1987) (stating that language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business" (internal quotations omitted)).
 
 
 47
 In order to analyze Bourne's contention that Disney has no right to produce videocassettes utilizing the Compositions, we first must look to the specific language of the grants. If the production of home videocassettes clearly falls outside the scope of the grants, then Disney's use of the Compositions was unauthorized as a matter of law, and, therefore, the district court erred in submitting this question to the jury.
 
 
 48
 The 1939 Pinocchio Agreement provided Disney with "the non-exclusive right to mechanically and/or electrically record the said musical compositions ... in synchronism with any and all of the motion pictures which may be made by [Disney]." (emphasis added). Similarly, the 1933 Shorts Agreement, which we believe also controlled Disney's rights with respect to the compositions from Snow White, granted to Disney "the right to record such music mechanically in any and all other motion pictures to be produced by [Disney]." (emphasis added). As is apparent from the emphasized portions of the quoted language, the issue is whether, as Bourne contends, the term "motion picture" unambiguously excludes home videocassettes.
 
 
 49
 In support of this contention, Bourne makes several arguments. First, Bourne notes that, during the 1930s, the term "motion picture" was used to refer to the exhibition of projected images from celluloid film in a theater. In that sense, it was a reference to a specific type of medium for distributing images, rather than to the actual content of the work itself. This understanding of the term "motion picture" was supported by the testimony of Bourne's expert witness, Renville McMann, Jr., an expert in television and videocassette technology.
 
 
 50
 Bourne also relies on the fact that the 1933 Shorts Agreement specifically gave Disney the right to use the Compositions on television, while the 1939 Pinocchio Agreement did not expressly grant Disney television rights. From this, Bourne asks us to infer that the parties intended only a narrow transfer of rights in the 1939 Pinocchio Agreement. Bourne also asks us to infer that the parties perceived a difference between a motion picture and the broadcast of the same on television.
 
 
 51
 In addition, Bourne emphasizes that video cassette recorders ("VCRs") and videocassettes were unknown commercially at the time the agreement was signed. Bourne argues that both the First and Ninth Circuits, as well as the New York state courts, have held "that rights to future technologies such as videocassette recording are not conveyed where the technology was unknown at the time the parties entered into the bargain and no broad license of rights exists." In making this argument, Bourne relies on a line of cases which essentially have held that the grant of television rights does not include home videocassette rights. See Rey v. Lafferty, 990 F.2d 1379, 1390 (1st Cir.) (license to produce episodes "for television viewing" held not to include home videocassette rights), cert. denied, --- U.S. ----, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993); Cohen v. Paramount Pictures Corp., 845 F.2d 851, 854 (9th Cir.1988) (holding that the right to exhibit a motion picture "by means of television" does not include the right to distribute videocassettes of the film); Tele-Pac, Inc. v. Grainger, 168 A.D.2d 11, 570 N.Y.S.2d 521, 522 (1st Dep't 1991) (license to distribute the subject motion pictures "for broadcasting by television or any other similar device now known or hereafter to be made known" held not to include home videocassette rights). These cases, however, did not address the precise issue presented here: whether the grant of rights to synchronize musical compositions with "motion pictures" allows for videocassette synchronization.
 
 
 52
 While the arguments relied upon by Bourne are not entirely without merit, we cannot agree that the term "motion picture" has a sufficiently definite and precise meaning as to allow for interpretation as a matter of law. Rather than referring simply to the celluloid-film medium, we believe that the term "motion picture" reasonably can be understood to refer to
 
 
 53
 a broad genus whose fundamental characteristic is a series of related images that impart an impression of motion when shown in succession, including any sounds integrally conjoined with the images. Under this concept the physical form in which the motion picture is fixed--film, tape, discs, and so forth--is irrelevant....
 
 
 54
 S.Rep. No. 72, 92d Cong., 1st Sess. 5 (1971), U.S.Code Cong. & Admin.News 1971 at 1566 (providing Congress' understanding of "motion pictures" under the Copyright Act of 1909). Peter Nolan, a long-time Disney employee, and Dr. Richard Koszarski, curator of the American Museum of the Moving Image, both testified in support of this understanding. As Dr. Koszarski explained, there is no practical difference between storing a motion picture on film, videocassette, or any other storage media. We also note that Congress adopted the broader definition of the term "motion picture" in enacting the Copyright Act of 1976, 17 U.S.C. Sec. 101. (" 'Motion pictures' are audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any.") Accordingly, we agree with the Fifth Circuit's decision in Bloom v. Hearst Entertainment, Inc., 33 F.3d 518, 525 (5th Cir.1994), in which the court held that "a general grant of motion picture rights is potentially broad enough to contemplate ... [videocassettes] as [a] means of distribution."
 
 
 55
 Insofar as Bourne contends that, because videocassettes were unknown at the time of the agreement, their use could not have been within the contemplation of the parties, we disagree. While the specific technology underlying today's VCRs was not available during the 1930s, Disney introduced credible evidence demonstrating that home viewing of motion pictures was within the contemplation of persons in the motion picture industry during the 1930s. Indeed, even in the 1930s Disney made available certain short subject cartoons for home viewing. Furthermore, Disney's expert witness, Dr. Koszarski, testified regarding the non-celluloid methods of storing motion pictures that were under development during the 1930s.
 
 
 56
 Having concluded that the language of the grant to Disney reasonably is broad enough to cover videocassettes and that the possibility that Disney could market its motion pictures for home viewing was recognized by persons knowledgeable in the entertainment and motion picture industries, we believe that the district court properly submitted to the jury the question of whether the 1933 Shorts Agreement and the 1939 Pinocchio Agreement provided Disney with the right to synchronize the Compositions to videocassettes containing its motion pictures.
 
 
 57
 c. Burden of Proof
 
 
 58
 Bourne contends that, even if the district court properly submitted the issue of contract interpretation to the jury, the court erred in its jury charge regarding the burden of proof. The district court charged the jury that Bourne, as the plaintiff-licensor, had the burden of proving that Disney's use of the Compositions was unauthorized. Bourne argues that a license is an affirmative defense to a claim of copyright infringement, and, therefore, that Disney had the burden of proving that its use of the Compositions was authorized.
 
 
 59
 Bourne is correct insofar as it contends that the possession of a license by an accused infringer traditionally has been characterized as a matter of affirmative defense. See, e.g., Melville B. Nimmer & David Nimmer, Nimmer on Copyright Sec. 13.01 ("Nimmer"). However, in most of the cases addressing the defense of license, the issue has been whether a license is held by the accused infringer. See, e.g., CMS Software Design Sys., Inc. v. Info Designs, Inc., 785 F.2d 1246, 1247 (5th Cir.1986). Since, in such cases, evidence of a license is readily available to the alleged licensee, it is sensible to place upon that party the burden of coming forward with evidence of a license. See United States v. Larracuente, 952 F.2d 672, 674 (2d Cir.1992) (holding that a defendant charged with criminal copyright infringement bears the burden of producing evidence of a sub-license).
 
 
 60
 In this case, however, there is no dispute that Disney received from Bourne various licenses to copyrighted compositions. The only dispute is whether Disney's synchronization of the Compositions with its home videocassettes and its use of the Compositions in its television commercials fall within the scope of the existing licenses. See Gilliam v. American Broadcasting Cos., 538 F.2d 14, 20 (2d Cir.1976) (licensee infringes owner's copyright if its use exceeds the scope of the license). Thus, the only dispute here is the scope of the licenses, not their existence.
 
 
 61
 We conclude that, in cases where only the scope of the license is at issue, the copyright owner bears the burden of proving that the defendant's copying was unauthorized. See S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1085 (9th Cir.1989) ("To prevail on its claim of copyright infringement, [the copyright owner] must prove ... 'copying' of protectible expression by [the accused infringer] beyond the scope of [the] license."); Microsoft Corp. v. Harmony Computers & Electronics, Inc., 846 F.Supp. 208, 210 (E.D.N.Y.1994); see also NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 235 n. 5 (7th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995). Copyright disputes involving only the scope of the alleged infringer's license present the court with a question that essentially is one of contract: whether the parties' license agreement encompasses the defendant's activities. Just as in an ordinary contract action, the party claiming a breach carries the burden of persuasion. See Gordon v. Leonetti, 324 F.2d 491, 492 (2d Cir.1963).
 
 
 62
 d. Disney's Right to Distribute Videocassettes
 
 
 63
 Bourne further argues that, even if Disney had the right to synchronize the Compositions with videocassettes, Disney had no right to sell or publicly distribute the videocassettes that it produced. Bourne asserts that Disney needed two separate grants from Bourne to make and distribute videocassettes containing the synchronized Compositions: (1) the right to copy (or record) the Compositions in synchronization with Disney's motion pictures; and (2) a separate right to sell or distribute the videocassettes. Since the grants to Disney do not specifically include the latter right, Bourne argues, Disney's sale and distribution of its videocassettes constitute an infringement of Bourne's copyrights in the Compositions, even if the license granted Disney the former right.
 
 
 64
 Under the Copyright Act of 1909 ("the 1909 Act"),[2] the copyright holder has the exclusive right to "publish ... and vend the copyrighted work." 17 U.S.C. Sec. 1(a) (1909 Act). Although Disney has been "vending" works without any express license from Bourne, Disney contends that its activities fall within the first sale doctrine. Section 27 of the 1909 Act provides:
 
 
 65
 The copyright is distinct from the property in the material object copyrighted, and the sale or conveyance ... of the material object shall not of itself constitute a transfer of the copyright ...; but nothing in this title shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained.
 
 
 66
 17 U.S.C. Sec. 27 (1909 Act) (emphasis added). A similar provision appears in the Copyright Act of 1976. See 17 U.S.C. Sec. 109.[3] These provisions generally are considered to enunciate the first sale doctrine. See Nimmer, supra, Sec. 8.12[B]. Disney argues that, since it was authorized under the various license agreements to synchronize the Compositions with its videocassettes, the first sale doctrine permits it to transfer the resulting videocassettes as it sees fit.
 
 
 67
 In Platt & Munk Co. v. Republic Graphics, Inc., 315 F.2d 847 (2d Cir.1963), this court noted that, while the language of section 27 is quite expansive, a literal reading of the statute is unacceptable, stating that
 
 
 68
 [i]f lawful possession by another sufficed to deprive the copyright proprietor of his right to control the transfer of the copyrighted objects, any bailee of such objects could sell them without infringing the copyright.... In view of the necessary role played by manufacturers, shippers, and others in producing and distributing copies of copyrighted works, ... a copyright proprietor could not present his work to the public without risking the loss of part of his copyright protection.
 
 
 69
 Id. at 851. The court also noted that a literal reading of the statute would leave a "purchaser of a copy from a conceded pirate ... free to resell" the copy. Id. Rather than looking simply at whether the lawful possession of the copy has passed, we framed the issue as "whether or not there has been such a disposition of the article that it may fairly be said that the ... [copyright proprietor] has received his reward for the use of the article." Id. at 854 (quoting United States v. Masonite Corp., 316 U.S. 265, 278, 62 S.Ct. 1070, 1077, 86 L.Ed. 1461 (1942)).
 
 
 70
 Relying primarily on Platt & Munk, Bourne contends that the first sale doctrine is inapplicable here. Bourne argues that Disney, even if it lawfully possessed the videocassettes, did not acquire the videocassettes as the result of a "first sale" by Bourne, the copyright owner. Since no transfer of copies passed from Bourne to Disney, Bourne argues that no "first sale" has occurred. We disagree.
 
 
 71
 In our view, Bourne reads our decision in Platt & Munk too broadly. This is not a case where the party claiming the benefit of the first sale doctrine is simply a bailee that acquired a possessory interest in the goods. For example, the possessor of the copies in Platt & Munk was an unpaid manufacturer of goods that were alleged to be defective by the copyright proprietor who had ordered them. 315 F.2d at 849. Here, the party claiming the benefit of the first sale doctrine, Disney, was licensed by Bourne to exploit the copyrighted compositions in connection with its motion pictures. Having so licensed Disney, we do not see any good reason why Disney should not be able to dispose of these lawfully made copies as it wishes. Accord Nimmer, Sec. 8.12[B].
 
 
 72
 Bourne also asserts that it received no "reward" for Disney's sale of copies of videocassette recordings containing the Compositions. This assertion, however, ignores the circumstances by which Bourne came to own these copyrights. As discussed above, the Compositions at issue here were created by Disney. Disney, in turn, conveyed these valuable copyrights to Bourne in exchange for, inter alia, a broad grant to Disney that would allow it to exploit the Compositions in connection with its motion pictures. Under the circumstances of this case, "it may fairly be said that [Bourne] has received [its] reward for the use of the article."[4] We therefore reject Bourne's contention that Disney's sale of videocassettes constituted infringement of Bourne's exclusive right to vend.
 
 2. Bourne's Other Contentions
 
 73
 Bourne objects to the district court's denial of certain ancillary relief in connection with the jury verdict in its favor on its advertising claim. We see no abuse of discretion in any of the district court's determinations regarding ancillary relief.
 
 
 74
 We have considered Bourne's remaining contentions and find them all to be without merit.
 
 3. The Cross-Appeal
 
 75
 Disney's principal contention on its cross-appeal is that the district court should have entered judgment as a matter of law on its affirmative defense of estoppel. Judgment as a matter of law cannot be granted on an issue if "there is [a] legally sufficient evidentiary basis for a reasonable jury to find" to the contrary. See Fed.R.Civ.P. 50. Our review of the record persuades us that a reasonable trier of fact could have found that Disney had not relied detrimentally on Bourne's conduct. See General Elec. Capital Corp. v. Armadora, S.A., 37 F.3d 41, 45 (2d Cir.1994). In particular, we note that Disney continued to obtain licenses from Bourne for the use of the Compositions in television advertisements during the 1970s and mid-1980s, and that Disney's paid television advertisements were infrequent up and through this time period. While Disney certainly provided strong evidence of estoppel, we believe that the jury was entitled to decide this issue in favor of Bourne.
 
 
 76
 We have considered Disney's remaining contentions and find them all to be without merit.
 
 CONCLUSION
 
 77
 In view of the foregoing, we affirm the judgment of the district court.
 
 
 
 *
 The Honorable Denise Cote of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 In an earlier appeal to this court, Bourne Co. v. Tower Records, Inc., 976 F.2d 99 (2d Cir.1992), we reversed the district court's grant of a preliminary injunction in favor of Bourne. We held that Bourne had failed to establish that it would suffer irreparable harm absent the issuance of an injunction, primarily because Disney had, for decades, used the Compositions for purposes other than the theatrical exhibition of motion pictures
 
 
 [2]
 Since the copyrights at issue were registered during the 1930s, when the 1909 Act was in force, plaintiff's claims must be analyzed under that act. See Playboy Enters., Inc. v. Dumas, 53 F.3d 549, 553 (2d Cir.1995)
 
 
 [3]
 Section 109 provides that, "[n]otwithstanding the [copyright owner's exclusive right to distribute copies granted by 17 U.S.C. Sec. 106(3) ], the owner of a particular copy or phonorecord lawfully made ... is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." 17 U.S.C. Sec. 109
 
 
 [4]
 We also note that a contrary interpretation would leave Disney in the position of having received a license to produce videocassettes of its motion pictures for home viewing by consumers, but being unable to sell or otherwise dispose of the videocassettes. This would make little sense. See Nimmer, supra, Sec. 10.10[C]