**Steven Michael HARRIS, Plaintiff,**

v.

**SIMON & SCHUSTER, INC., and The McGraw–Hill Companies, Inc., Defendants.**

**No. 08 Civ. 3477.**

United States District Court, S.D. New York.

Aug. 18, 2009.

Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd., by: William J. Castillo, Esq., Manny Pokotilow, Esq., Salvatore Guerriero, Esq., Philadelphia, PA, for Plaintiff.

Davis Wright Tremaine LLP, by: Marcia B. Paul, Esq., Bryan M. Tallevi, Esq., New York, NY, for Defendants.

*OPINION*

SWEET, District Judge.

Defendants Simon & Schuster, Inc. ("S & S") and The McGraw–Hill Companies, Inc. ("MGH") (collectively, the "Defendants") have moved pursuant to Rule 56, Fed.R.Civ.P., for summary judgment dismissing the complaint of plaintiff Steven Michael Harris ("Harris" or the "Plaintiff") alleging copyright violation by Defendants of the book *This is My Trunk* (the "Work") authored by Harris, as well as prevailing party attorneys' fees. Upon the facts and conclusions set forth below, the motion is denied.

## I. PRIOR PROCEEDINGS

The complaint alleging direct and contributory copyright violations by Defendants was filed on April 10, 2008.

After reference to the Honorable Henry B. Pittman, Magistrate Judge, for settlement, the instant motion was made, heard and marked fully submitted on October 30, 2008.

## II. FACTS

The parties have set forth the facts in the Defendants' Rule 56.1 Statement, the Plaintiff's Rule 56.1 Counterstatement and supporting and reply affidavits. The facts are not in dispute except as noted below.

### A. *The Publishing Agreements*

Harris was a clown with Ringling Brothers and Barnurn and Bailey Circus and wrote the Work, a book for children, in 1983 about that experience.

The Work was illustrated by Norma Welliver ("Welliver") and published by Atheneum Publishers, Inc. ("Atheneum") in 1985 pursuant to two agreements. The first, dated August 22, 1984, was executed on or about August 29, 1984, between Harris and Atheneum (the "Harris Agreement"). The second agreement was dated August 22, 1984, and executed on or about September 4, 1984, between Welliver and Atheneum (the "Welliver Agreement") (collectively, the "Publishing Agreements"). On March 17, 2008, Welliver assigned her full right, title and interest under the Welliver Agreement to Harris. As successor-in-interest to Atheneum, S & S acquired Atheneum's rights and obligations under the Publishing Agreements.

The Publishing Agreements are substantially identical. Paragraph 10 grants S & S the "exclusive right . . . to license, sell or otherwise dispose of the following rights" in the Work:

> publication or sale of your work by book clubs; publication of a reprint edition of your work by another publisher; condensations; serializations in magazines or newspapers (whether in one or more

installments ... after book publication); publication of your work and selections therefrom in anthologies, compilations and digests; picturized book versions, microprint and microfilm versions.

Weidman Aff., Exh. B at ¶ 10, Exh. C at SI 10.[1] Paragraph 19 provides that "[a]ny rights in your work not specifically granted to us hereunder are reserved to you." *Id.*, Exh. B at ¶ 19, Exh. C at ¶ 19.

Both Publishing Agreements are standardized, "form" contracts of Atheneum. Without an agent or an attorney, Plaintiff negotiated and executed the Harris Agreement and other than his signature, the date of his signature, his Social Security Number, and the handwritten Salisbury, Vermont address, none of the language, interlineations or markings shown on the copy of the Harris Agreement were made by Harris.

When the Work was first published, Harris developed a presentation on the topic of writing for students, in which Harris used the clown props described in the Work to discuss writing and language arts. Harris used the Work, samples from its original manuscript, the galley proofs for the Work and rejection letters from publishers to explain the difficult process by which a writer's book gets published.

After its publication, the Work was nominated for several awards. In early 1987, Marcia Marshall ("Marshall"), an editor at Atheneum, telephoned Harris about its nomination for the Texas Bluebonnet Award, an award sponsored by the Texas Library Association, and told Harris that Atheneum was running low on its stock of the Work. Harris asked Marshall to have

Atheneum publish more copies of the Work. Marshall advised Harris that Atheneum would not do a second printing unless both Harris and Welliver reduced their royalties on all copies sold for the second printing. Harris agreed to a lower royalty in consideration of a second printing by Atheneum.

On or around July 27, 1987, Marshall mailed Harris a rider to the Harris Agreement reflecting this change in royalties and requesting Harris sign and return the rider to Atheneum along with the initial Harris Agreement. Plaintiff signed this rider and sent it, along with the original Harris Agreement, to Atheneum.

After Spring 1989, Harris does not recall having received any further communications from Atheneum or any further royalty payments until immediately prior to the filing of the instant suit.

In 1995, Harris became interested in pursuing new publishing opportunities with regard to the Work. When he sought to contact Atheneum, he discovered that the publishing rights now belonged to S & S. At that time, he inquired about getting the rights back and requested a copy of the Publishing Agreement. Harris did not receive any communications or a copy of the Agreement from S & S in response.

### B. *The Standardized Tests*

CTB/McGraw–Hill LLC ("CTB"), sued here as MGH, develops, publishes and licenses standardized tests for middle school students and other learners, which are then purchased and administered by testing authorities such as school boards and

---

**1.** Paragraph 10 of the Harris Agreement differs from the same paragraph of the Welliver Agreement in that the following derivative rights have been struck from that provision of the Harris Agreement only: "dramatic, motion picture (including but not by way of limitation, film strips based on the story and film strips or motion picture photographed directly from the book), phonograph, and broadcasting rights, and electronic, mechanical or visual reproduction rights; publication of your work in the British Commonwealth, publication of your work in foreign languages." Weidman Aff., Exh. B at ¶ 10.

other governmental entities. The tests developed and published by CTB vary in length, number of questions, and subject matter, and contain a variety of different sections, including reading, language arts, mathematics, social studies, and science. The reading and language arts sections of these tests contain excerpts from various literary works licensed to CTB from publishing companies and authors. A series of related questions designed by CTB to evaluate the test-taker's reading comprehension follows each excerpt.

On three separate occasions on June 15, 1998 (the "1998 License"), August 17, 2003 (the "2003 License"), and August 1, 2006 (the "2006 License") (collectively, the "Licenses"), S & S granted CTB licenses to use an excerpt from the Work in certain CTB tests.

The 1998 License granted CTB the right to use "5 text pages and 2 illustrations" from the Work in the "California Achievement Test, 6th Edition Tryout test and repeat use in other CTB tests for a period of five years." *Id.*, Exh. F. The 1998 License applied "only to the edition of the work specified in this agreement, limited to a print run of 3,300 copies" and "solely to publication of the above-cited work in the English language in the State of California." *Id.* In addition, it provided that the "permission granted herein is non-exclusive and not transferable." *Id.*

The 2003 License granted CTB permission to use "4 text pages and illustration" from the Work in "soft cover test booklets for the TCAP/O 2004 Operational test and repeat use for a five year period in other CTB tests" and limited the print run to 90,000 copies. *Id.* The 2003 License similarly limited its scope "to publication of the above-cited work in the English language in the State of Tennessee," and again provided that the "permission granted herein is non-exclusive and not transferable." *Id.*

Finally, the 2006 License granted CTB a limited license for a one-time use of "4 text pages and 2 illustrations" from the Work in "softcover test booklets for the Hawaii 2006 Operational Test for use during September 2006" and applied "solely to publication of the above-cited work in the English language in the State of Hawaii." *Id.* The 2006 License also provided that the "permission granted herein is non-exclusive and not transferable." *Id.* No custom test was ultimately developed, and therefore CTB never reproduced the Work pursuant to the 2006 License.

According to Harris, CTB also "sublicensed" the Work to a third party, American Institutes for Research ("AIR"), a developer of educational testing programs. Harris alleges that CTB allowed AIR to use the Work in connection with its development of the Hawaii Operational Test that was administered in Spring of 2007, 2008 and 2009.

The relevant excerpt of the Work used by CTB in the tests consisted of a verbatim reproduction of a portion of the text from pages 7–11 of the Work and two illustrations taken from the same pages (the "Passage"). The Passage differed from the Work in that the font was changed, three illustrations were taken out and the remaining illustrations rearranged. CTB also added original questions, which were related to and dependent upon the text of the Work, to the end of the Passage. According to CTB, in each of the seventeen standardized tests from 1998 through the present in which the Work was excerpted, the identical Passage was used and Harris and Welliver were credited as the author and illustrator, respectively. CTB reproduced the Passage alongside excerpts from between four and twelve other literary works, questions relating to the excerpts, and other original program design material.

On April 26, 2007, about a week after Harris had conducted one of the educational presentations described above, he discovered that the Work was being used in connection with a standardized achievement test entitled *TerraNova, The Second Edition, CAT Survey, Form C* ("TerraNova Test"). After learning of this use of the Work, Harris spoke with Christopher Fuller ("Fuller"), an S & S employee, and expressed his concern.

Approximately six months later, on November 14, 2007, Harris wrote the legal department of S & S stating that the use of the Work in the TerraNova Test was made without his prior knowledge and was unauthorized. Jennifer Weidman ("Weidman"), Vice President and Senior Counsel of S & S, responded to Harris's letter and stated that the reason why Harris never received any royalty statements from the use of the Work in CTB's standardized achievement tests was due to the fact that Harris had changed his address without notifying S & S and advised Harris that the last address S & S had for him was "121 Main South Main, Middlebury, VT 05753."

After Harris presented his objections to Weidman, S & S sent him two checks for the royalties that were allegedly due under the Harris Agreement. By letter dated March 13, 2008, Harris returned that royalty payment to S & S. Upon learning that Welliver had assigned her rights to Harris, S & S sent another payment of $15,148.82 to Harris for the total amount allegedly owed him under the Publishing Agreements, which Harris again refused. The instant action ensued.

## III. THE SUMMARY JUDGMENT STANDARD

Summary judgment is granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 338 (2d Cir. 2004). The courts do not try issues of fact on a motion for summary judgment, but, rather, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

For the purposes of summary judgment, "[a] fact is 'material' ... if it 'might affect the outcome of the suit under the governing law' ... [and an] issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir.2001) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). The moving party has the initial burden of showing that there are no material facts in dispute, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

In determining whether a genuine issue of material fact does exist, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gibbs–Alfano v. Burton*, 281 F.3d 12, 18

(2d Cir.2002). However, "the non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." *Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir.1999) (quotation and citation omitted).

## IV. DISCUSSION

Defendants argue that summary judgment is appropriate here because, in licensing the Work to CTB for use in the tests, both S & S and CTB acted within the scope of their rights as set forth in the Publishing Agreements and the Licenses. While the Court agrees with Defendants that the Publishing Agreements authorized S & S to license the Work for use in standardized tests of the type published by CTB, whether CTB acted within the scope of its Licenses cannot be determined on these facts and therefore summary judgment must be denied.

### A. *The Tests Constitute Compilations*

■ The Publishing Agreements provide S & S with the exclusive right to "license, sell or otherwise dispose" of certain enumerated rights in the Work, including, *inter alia,* publication of the Work and selections therefrom "in anthologies, compilations and digests." Weidman Aff., Exh. B at ¶ 10; Exh. C at ¶ 10. It is Defendants' position that because the tests constitute "compilations," S & S's licensing of the Work to CTB was authorized and not a copyright violation.

The Copyright Act defines a "compilation" as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101; *see* 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 3.02 ("[A] 'compi-

lation' results from a process of selecting, bringing together, organizing, and arranging previously existing material of all kinds . . . ." (internal citation omitted)). The definition of compilation includes "collective works," which are independently defined as works "in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." 17 U.S.C. § 101. Collective works are a species of compilations, resulting from the selection and arrangement of brief portions of independent, copyrightable works into a single work. *See Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad., Sys.,* 672 F.2d 1095, 1098, n. 5 (2d Cir.1982) (describing subject work as "more precisely a collective work," rather than a compilation, "since its components, excerpts from copyrighted films, are independent works in themselves" (internal quotations omitted)).

According to Defendants, standardized tests are prototypical examples of compilations. Each test combines licensed excerpts from literary works with original materials, including questions, for the purpose of creating original and effective testing devices, resulting in new works of authorship. Indeed, other courts have held that this type of test "easily meets" the definition of a compilation and merits copyright protection. *See Educ. Testing Serv. v. Simon,* 95 F.Supp.2d 1081, 1088–89 (C.D.Cal.1999).

Harris vigorously disputes the characterization of the tests as "compilations," since the tests do more than merely combine the Work with other works. Rather, Harris argues, because the tests also "recast" the Work by excising certain text and illustrations and rearranging them as part of a new work, they constitute "derivative works," which fall outside the scope of rights conferred to S & S pursuant to

the Publishing Agreements. A "derivative work" is defined by the Copyright Act as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. The difference between a compilation on the one hand and a derivative work on the other has been described thusly: "[W]hile a compilation consists merely of the selection and arrangement of pre-existing material without any internal changes in such material, a derivative work involves recasting or transformation, *i.e.*, changes in the preexisting material, whether or not it is juxtaposed in an arrangement with other pre-existing materials." *1 Nimmer* § 3.02.

Although Plaintiff makes much of the fact that the Copyright Act includes two different definitions for "derivative works" and "compilations," the definition of a derivative work is broad, *see 1 Nimmer* § 3.01 ("In a broad sense, almost all works are derivative works in that in some degree they are derived from pre-existing works."), and Harris points to no provision of the Copyright Act that indicates that, in certain circumstances, a compilation cannot also be a derivative work. Indeed, "[a] collective work more nearly resembles a derivative work than it does other *forms of* compilation.... The fact that the originality called for in a collective work consists of the collection and assembling of pre-existing works, while derivative work originality lies in the manner in which a pre-existing work is transformed, would not appear to justify a difference in substantive treatment, and hence, not require a terminological distinction." *Id.* § 3.02.

In emphasizing the distinction between a derivative work and a compilation, Harris cites *Jarvis v. K2 Inc.*, 486 F.3d 526 (9th

Cir.2007). In *Jarvis,* the defendant combined a series of photographs taken by plaintiff into a collage after his license to use the images had expired. In its use of the photos, the new collages "shrank, expanded, distorted, overlaid and otherwise edited the original images, while also combining them with photos taken by other photographers, additional graphics, the K2 logo and marketing slogans." *Id.* at 531 (citation omitted). On those facts, the court held that the resulting collage constituted a derivative work, rather than a collective work, for the limited purpose of determining whether the § 17 U.S.C. 201(c) privilege applied. *Id.* at 532.

The distinction made in *Jarvis* is an example of one of a limited number of cases where such categorization matters. *See 1 Nimmer* § 3.08. The distinction between a collective work and a derivative work is of even less import here where the Publishing Agreements permit use of the Work in compilations, as well as periodicals, digests, and condensations. All three of these latter types of work fit squarely within the statutory definition of a derivative work, indicating that derivative works are not categorically excluded from the Publishing Agreements as Harris contends. The standardized tests, which excerpt, arrange, and recast preexisting works in ways similar to the types of derivative works listed above, constitute collective works and are therefore permitted under the Publishing Agreements.

Harris also argues that the Publishing Agreements only grant S & S the right to license the Work for use in books. In support of his argument, Harris points to the provision of the Publishing Agreements that reserves all rights not granted to S & S in the author. Such a provision however, does not clarify the scope of the agreement itself. *See Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.,*

145 F.3d 481, 488 (2d Cir.1998) ("The reservation clause stands for no more than the truism that [plaintiff] retained whatever he had not granted. It contributes nothing to the definition of the boundaries of the license."). More significantly, the Publishing Agreements do not, by their own terms, limit S & S's right to license use of the Work to books. Paragraph 10 explicitly grants the right to publish the Work in periodicals, newspapers and magazines. While Harris places significance on the deletion from the Harris Agreement of motion picture, dramatic, phonographic and broadcast rights, this alteration does not affect an unambiguous reading of the Harris Agreement which does grant S & S the right to license the Work for use in compilations. *See Reinhardt v. Wal–Mart Stores, Inc.,* 547 F.Supp.2d 346, 352 (S.D.N.Y.2008) ("If the contract language is unambiguous and conveys a definite meaning, its interpretation is a question of law for the court.").

Based on the foregoing, the tests constitute compilations and S & S was within its rights under the Publishing Agreements in licensing the Work to CTB.

### B. *The Licenses Are Ambiguous as to Whether Use of the Work in the Tests Was Within the Scope of the Licenses*

■ In opposition to Defendants' motion, Harris argues that even if it was within S & S's rights to license the Work to CTB for use in the Tests, CTB exceeded the scope of the Licenses. Harris specifically claims that CTB exceeded the scope of the Licenses by publishing the Work in locales not explicitly covered by the Licenses. CTB reproduced the Passage in seventeen different standardized tests from 1998 through 2008. According to Harris, twelve of the tests were published and administered in places other than those specified in the Licenses. Because the Licenses do not unambiguously author-ize CTB's use of the Work in tests outside the specified locales, Defendants' motion must be denied.

■ As an initial matter, the statute of limitations in copyright actions is three years. 17 U.S.C. § 507(b). Although the Copyright Act is silent as to when the claim accrues and the Court of Appeals has not yet addressed the issue, the majority of courts in this Circuit have most recently concluded that a copyright claim accrues at the time of infringement, rather than at the time of discovery. *See Auscape Int'l v. Nat'l Geographic Soc.,* 409 F.Supp.2d 235, 247 (S.D.N.Y.2004) (analyzing case law, text and legislative history of Copyright Act in concluding that "copyright infringement accrues on the date of the infringement"); *Broadvision Inc. v. Gen. Elec. Co.,* No. 08 Civ. 1478(WHP), 2009 WL 1392059, at *6 (S.D.N.Y. May 5, 2009) (listing cases). Accordingly, to the extent Harris argues that CTB exceeded the scope of the Licenses with respect to tests published prior to April 2005, those claims are time-barred and cannot be maintained.

■ A valid license, either exclusive or non-exclusive, "immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor." *Davis v. Blige,* 505 F.3d 90, 100 (2d Cir.2007). "[D]etermining whether a defendant's activities fall within the scope of an existing license essentially involves a question of contract interpretation." *Reinhardt,* 547 F.Supp.2d at 352. "If the contract language is unambiguous and conveys a definite meaning, its interpretation is a question of law for the court." *Id.* Where, however, "the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, then the interpretation of the contract becomes a question of fact for the jury and

extrinsic evidence of the parties' intent properly is admissible." *Bourne v. Walt Disney Co.*, 68 F.3d 621, 629 (2d Cir.1995) (internal quotations and citation omitted). Where the issue is the scope of the license, " 'the copyright owner bears the burden of proving that the defendant's copying was unauthorized.' " *Tasini v. New York Times Co.*, 206 F.3d 161, 171 (2d Cir.2000) (quoting *Bourne*, 68 F.3d at 631).

With respect to uses of the Work by CTB in tests published after April 2005, Defendants contend that permission to reprint the Passage in different territories was based on the 2003 License which expressly provided for "repeat use" in other CTB tests for a period of five years.[2] For each test in which the Passage appeared, S & S authorized and received payment for the repeat use of the Work pursuant to the terms of the 2003 License and documented the use by correspondence referencing the applicable underlying license and evidence of payment for the repeat uses. Although all three Licenses included geographical restrictions for the initial use of the Work, Defendants argue that no such limitation applied in connection with its repeat use.

Defendants' interpretation granting CTB the right to re-publish an excerpt of the Work outside the limited geographical area identified in the 2003 License is far from apparent from text of the Licenses. The 2003 License explicitly limits permission "solely to publication of the above-cited work in the English language in the State of Tennessee." Defendants ask the Court to assume that this limitation does not apply to the "repeat use for a five year period in other CTB tests," but point only to the fact that CTB routinely paid for,

and S & S consented to, repeat uses of the Work in other states pursuant in support of their interpretation. Because the Court finds that the language used in the Licenses with respect to the repeat use and limited geographic scope of the Work is ambiguous, summary judgment is improper at this time.

Defendants argue that even if CTB did exceed the scope of the 2003 License, the so-called infringements Harris complains of must be dismissed because they do not constitute copyright claims and can only be brought as breach of contract claims. However, insofar as Harris alleges that CTB exceeded the scope of its Licenses by publishing the Work in states other than those identified, he states a valid claim for copyright infringement. *See Tasini*, 206 F.3d at 170 ("[T]he fact that a party has licensed certain rights to its copyright to another party does not prohibit the licensor from bringing an infringement action where it believes the license is exceeded or the agreement breached."); *Amy Axelrod, Inc. v. Simon & Schuster, Inc.*, No. 07 Civ. 891(DLC), 2007 WL 2412257, at *4 (S.D.N.Y. Aug. 27, 2007) (rejecting argument that copyright owner who granted license waived right to sue under copyright statute); *Kanakos v. MX Trading Corp.*, No. 81 Civ. 4632(WCC), 1981 WL 1377, at *2 (S.D.N.Y. Sept. 16, 1981) ("Where a licensee utilizes a copyrighted work in a manner or to an extent not authorized by the license agreement, the licensee's position is no different from that of an infringer having no contractual relationship with the holder of the copyright

---

**2.** Since any use of the Work pursuant to the 1998 License and the five year period in which reprints were authorized would have been made prior to 2005, Harris's claims with respect to any use pursuant to the 1998 License would be barred by the statute of limitations, discussed *supra*. In addition, while a separate license was obtained for the Hawaii 2006 Operational Test, a custom test was never developed and CTB administered its Terra Nova Form C test relying on the 2003 License, so no infringement under the 2006 License ever occurred. This Court's analysis will, therefore, focus on the 2003 License.

[and] the resulting cause of action is one for copyright infringement . . . .").

█ Defendants also challenge Harris's standing to sue CTB for copyright infringement since S & S has the exclusive right to license excerpts from the Work. Under the Copyright Act, only "the legal or beneficial owner of an exclusive right under a copyright" has standing to sue for infringement. 17 U.S.C. § 501(b). Because "[a]n exclusive license granted by the copyright owner constitutes a transfer of ownership of the copyright rights conveyed in the license," *U.S. Naval Inst. v. Charter Comm'ns, Inc.,* 936 F.2d 692, 695 (2d Cir.1991) (citing 17 U.S.C. § 101), Defendants contend that only S & S has standing to sue CTB for any alleged infringement. *See Nimmer* § 12.02 ("Once the copyright owner grants an exclusive license of particular rights, only the exclusive licensee, and not his grantor, may sue for later occurring infringements of such rights.").

Harris is not, however, just any grantor of the exclusive right to license the Work; as author and sole copyright holder, he granted S & S limited rights in the Work in exchange for the payment of royalties. As such, Harris qualifies as a "beneficial owner," and retains standing to sue. *See Cortner v. Israel,* 732 F.2d 267, 271 (2d Cir.1984) ("When a composer assigns copyright title to a publisher in exchange for the payment of royalties, an equitable trust relationship is established between the two parties which gives the composer standing to sue for infringement of that copyright."); *Kamakazi Music Corp. v. Robbins Music Corp.,* 534 F.Supp. 69, 74 (S.D.N.Y.1982) (recognizing songwriter as proper plaintiff under § 501(b) "since he transferred legal title to the copyrights in exchange for a percent of the royalties based on sales of license fees"); *Silberman v. Innovation Luggage, Inc.,* No. 01 Civ. 7109(GEL), 2003 WL 1787123, at *7 n. 5

(S.D.N.Y. Apr. 3, 2003) (noting that even if plaintiff was no longer the legal owner of the right at issue, "he could still have standing to sue as beneficial owner of that right, based on royalties received or other indicia of control").

█ Of Harris's remaining complaints related to the Licenses, only one survives. First, while the Licenses contain restrictions of the modifications CTB can make to the Work, none of the Licenses purport to limit CTB's ability to change the font of the text. *See* Weidman Aff., Ex. F ("The undersigned agrees . . . 4) To make no deletions from, additions to, or changes in the text, without the written approval of Simon & Schuster."). Unlike the text and illustrations in the Work, fonts are not protected by the federal copyright statute, and therefore Harris's allegation that CTB altered the font of the Passage in violation of his copyright is without merit. *See* 37 C.F.R. § 202.1.

█ Similarly, Harris's claim that CTB exceeded the scope of the Licenses by "sublicensing" the right to reprint the Work to AIR in violation of the Licenses which provide that the agreement is "non-exclusive and not transferable," is barred by the Copyright Act itself. Section § 201(c) states that "[i]n the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that collective work, any revision of that collective work, and any later collective work in the same series." Although the Licenses state that the permission to use plaintiff's Work is not transferable, the 201(c) privilege "is a component of the copyright in the collective work, not the copyright in the individual contributions," *Faulkner v. Nat'l Geographic Society,* 294 F.Supp.2d 523, 546 (S.D.N.Y.2003), *aff'd in*

*relevant part,* 409 F.3d 26 (2d Cir.2005), and therefore any arguable "sublicense" in the Work as it was used in the tests is statutorily privileged and does not constitute copyright infringement.

As to Harris's final complaint that the 2003 License authorized the use of only 4, rather than 5, text pages, Defendants claim it was S & S's understanding that each use and repeat use by CTB would be of the same Passage, notwithstanding any purported limitations in the 2003 License. The text of the 2003 License is, however, clear as to the selection of the Work covered by the agreement, and Defendants' argument to the contrary is not persuasive.

Based on the foregoing, Defendants' motion for summary judgment is denied.

### C. *The Request for Attorneys' Fees is Denied*

Defendants also seek an award of attorneys' fees pursuant to Section 505 of the Copyright Act. In light of the Court's denial of Defendants' motion, the application for attorneys' fees is also denied.

### *Conclusion*

Based on the facts and conclusions set forth above, Defendants' motion is denied.

It is so ordered.