**FINANCIAL TECHNOLOGIES INTERNATIONAL, INC.,**
Plaintiff,

v.

**Scott D. SMITH and Datasmith Consulting, Inc.,**
Defendants.

**No. 99 Civ. 9351(GEL).**

United States District Court,
S.D. New York.

Nov. 6, 2002.

James M. Bollinger (Philip L. Hirschhorn, on the brief), Hopgood, Calimafde, Judlowe, Mondolino, LLP, New York City, for Plaintiff and Counterclaim–Defendant Financial Technologies International, Inc.

Christopher M. Paparella, Nixon Peabody LLP, New York City, for Defendants

Scott D. Smith and Datasmith Consulting, Inc.

## OPINION AND ORDER

LYNCH, District Judge.

This dispute involves intellectual property conceived of by Scott Smith ("Smith") during the course of his work as an independent contractor for Financial Technologies International, Inc. ("FTI" or "plaintiff"). Under an agreement between FTI and Smith's corporation, Datasmith Consulting, Inc. ("Datasmith"), Smith worked as a consultant for FTI between March 1998 and July 1999. FTI claims ownership of a product developed by Smith (the "Product") that improves its datamapping system and accompanying software. FTI asserts two claims under the consulting agreement (the "Agreement"), alleging that the Agreement gives FTI ownership of all intellectual property developed during the course of Smith's employment, and that Smith and Datasmith breached the Agreement's confidentiality provision by using FTI's proprietary information to develop the Product. FTI also claims that Smith and Datasmith misappropriated FTI's trade secrets in order to develop the Product, and that they are continuing to do so by marketing the Product under Datasmith's name. Defendants, in turn, assert three counterclaims against FTI for breach of contract, conversion, and violation of New York Labor Law, all based on FTI's failure to promptly pay Datasmith's last invoice for services and travel expenses.

Defendants have moved for summary judgment on all of FTI's claims, as well as on their breach of contract and Labor Law counterclaims. FTI cross-moves for summary judgment on its claims and on all of the counterclaims. FTI's motion for summary judgment on the conversion and Labor Law counterclaims is granted. Both FTI's and defendants' motions for summary judgment on FTI's claims and on defendants' breach of contract counterclaim are denied.

## BACKGROUND

FTI is a technology company based in Manhattan that provides database software to financial companies. The software, known as "streetdata," uses FTI's Global Financial Data Model ("GFDM") to provide database management to financial institutions. (Pl. Mem. at 3–7.) These institutions rely on products like streetdata to take real-time financial data from various vendors and organize it into structured, manipulable databases. A crucial step in this process is datamapping, in which raw financial data is formatted and "mapped" into appropriate locations in a database. (*Id.* at 7.) FTI not only provides its streetdata database software to financial institutions, but also often serves as a consultant to its clients, offering continuing technological support and training. (*Id.*)

In February 1998, FTI approached Scott Smith, whom it had twice previously employed, and offered him a full-time job as an independent consultant. (Smith Decl. ¶ 25.) Smith has extensive experience in the management of market and other financial data (*id.* ¶ 13), and FTI offered him a job as a "Business/Implementation Consultant" to train FTI's clients in the use of its software products. (*Id.* ¶¶ 13, 38 & Exs. 4, 6.) FTI asked Smith to form a corporation before contracting with FTI, so Smith formed Datasmith in order to sign the Agreement. (Smith Dep. at 141; Reinhardt Dep. at 111.) Smith and his wife are the only shareholders of Datasmith, and Smith is its only officer and employee. (Smith Dep. at 153; Smith Decl. ¶ 27.) In March 1998, Datasmith and FTI entered into the

Agreement. (P. Smith Dep. at 69; Smith Decl. ¶ 27.) While it is unclear whether Smith and Datasmith were represented by counsel in connection with entering the Agreement, (9/17/02 Tr. at 5; Smith Dep. at 158–59), Smith is himself a lawyer, and he was given an opportunity to review. the terms of the Agreement to ensure that they were acceptable. (Smith Dep. at 242.)

The Agreement provided in Paragraph 7 that "all information, reports, studies, object or source code, flow charts, diagrams and other tangible or intangible material ... produced by or as a result of any of the Services ... shall be the sole and exclusive property of FTI...." (Agreement ¶ 7.) In addition, Paragraph 10 obligated Datasmith to refrain from disclosing or using for its own purposes any of FTI's "information which has commercial value in its business and which is not in the public domain." (Id. ¶ 10.) Also under Paragraph 10, Datasmith promised to enter into agreements with its employees that required them to comply with Paragraph 10, and that designated FTI a third-party beneficiary of those contracts. (Id.) Datasmith neglected to fulfill its obligations under Paragraph 10, so Smith never signed an agreement with Datasmith that required him to abide by FTI's confidentiality requirements. (Smith Dep. at 158.)

Between March 1998 and May 1999, Smith worked for FTI as a consultant, training clients on the use of FTI's datamapping software, including streetdata, and providing on-site support for the software. (Reinhardt Dep. at 33; Smith Decl. ¶ 38.) In May 1999, Smith was reassigned to work on a project to improve streetdata based on clients' comments. (Lehman Dep. at 59–60.) While Smith was apparently working at a higher level of abstraction than the programming engineers (his contribution involved taking a larger view of the software, from the clients'-perspective), it is unclear whether he did any programming. (Id.) Smith continued to work on the streetdata project until he was fired in July. (Id.)

In March 1999, Smith approached his direct supervisor. Gary Reinhardt, with a written proposal describing an idea for a Microsoft Access application that would facilitate the process of datamapping. (Smith Decl. ¶ 62; Reinhardt Dep. at 54–55.) Smith asserts that he showed the same proposal to Kenneth Lehman, a senior FTI officer, at the same time (Smith Decl. ¶ 62), but Lehman states that he did not see the initial proposal until May 1999. (Lehman Dep. at 95.) At some point, in March or May, Smith was able to use his laptop to show Lehman something having to do with the Product, but it is unclear whether Lehman saw a working prototype of the Product, or perhaps a computerized version of the proposal. (Id. at 97–98.)

The March proposal did not claim that Datasmith owned the Product, or mention Paragraph 7 of the Agreement, (Smith Decl. Ex. 7), but Smith testified that he informed Reinhardt that he believed that Datasmith would own the Product. (Smith Dep. at 199.) According to Smith, Reinhardt and Lehman told him that FTI might be interested in licensing Smith's Product, and that he should show the Product to them again when he had developed it beyond the idea stage. (Id. at 198; Smith Decl. ¶¶ 62, 65.) Reinhardt testified that he told Smith in April that he thought that Smith might have misappropriated FTI's proprietary information in the process of developing the Product (Reinhardt Dep. at 60–61), but Smith asserts that nobody at FTI ever mentioned the possibility of misappropriation, or that FTI might own the Product. (Smith Decl. ¶¶ 64–65.)

On or around July 21, 1999, Smith prepared a more extensive proposal in order to market the Product to FTI, gave it to Reinhardt for comments, and then presented it to Lehman. (Smith Decl. ¶ 92 & Ex. 11.) The proposal explained how the Product would improve FTI's GFDM by making it easier for clients to use. Smith asserts that the proposal focused on the GFDM only because he was attempting to market the Product to FTI, and that it would work with any datamapping system. (*Id.* ¶ 89.) FTI contends that the proposal's emphasis indicates that Smith could not have developed the Product without having used the GFDM as a basis. (Pl. Mem. at 11.)

In the July proposal, Smith asserted that the Product was owned by Datasmith, and that it was not the result of any of Smith's work for FTI. (Smith Decl. ¶ 92 & Ex. 11.) He also indicated that he wanted to provide FTI with a free license to use the Product, in return for its retention of Datasmith as a consultant. (*Id.*) On July 23, 1999, Smith was summarily fired, and on July 26, he received a letter from FTI's general counsel, asserting FTI's ownership of the Product under Paragraph 7, and demanding that Smith and Datasmith turn over all materials relating to the Product. (*Id.* Ex. 12.)

After Smith was fired, Datasmith submitted a $12,000 invoice for services rendered in July, which FTI refused to pay, based on its view that Smith and Datasmith had breached the Agreement. (Pl. Mem. at 16.) The invoice did not include a $3600 airplane ticket that Smith had used to travel to London for FTI, and $733.28 in travel expenses, because Smith assumed that FTI had followed its usual practice of paying for travel expenses itself, rather than having Smith pay and later reimbursing him. (Smith Decl. ¶¶ 79, 101.) Smith later discovered, however, that FTI had charged the plane ticket to his credit card. (*Id.* ¶ 101.) Paragraph 2 of the Agreement obligated FTI to pay Datasmith on a monthly basis for Smith's work, and to reimburse Datasmith for any expenses incurred on FTI's behalf. (Agreement ¶ 2.) FTI paid the $16,402.58 total balance (covering the invoice, the plane ticket, and the travel expenses) in April 2000, but did not pay any of the interest that had accrued in the nine months since the invoice had been due. (Defs. Mem. at 6.)

## DISCUSSION

### I. *The Parties' Contentions*

FTI asserts three claims against Datasmith and Smith, all arising out of Smith's development and subsequent exploitation of the Product. First, FTI alleges that Datasmith breached its obligations under Paragraph 7 of the Agreement by refusing to turn over the Product and related materials to FTI, because the Product is intellectual property "produced by or as a result of" Smith's employment with FTI, and thus is the sole property of FTI. (Pl. Mem. at 1.) FTI also contends that both Datasmith and Smith breached Paragraph 10[1] by using FTI's proprietary information for their own purposes in developing the Product, and, since FTI asserts ownership of the Product, by continuing to market it under Datasmith's name.[2] Finally, FTI

---

1. While only Datasmith and FTI are parties to the Agreement. FTI asserts that Smith is also bound by the Agreement because Paragraph 10 obligated Datasmith to create a confidentiality agreement with Smith, of which FTI was to be a third-party beneficiary. (Pl. Mem. at 15 n. 8.)

2. It is not entirely clear whether FTI claims that defendants' marketing of the Product violates Paragraph 10 because the Product itself is FTI's confidential information, or because the Product utilizes FTI's confidential information. The Court will assume that the former is the correct interpretation of FTI's posi-

asserts a claim against both Datasmith and Smith for misappropriation of trade secrets, again based on defendants' development and use of the Product. FTI seeks compensatory damages and a permanent injunction that prohibits both defendants from using and disclosing the Product and all FTI trade secrets, and requires them to deliver to FTI all copies of the Product and related materials. (Compl. ¶¶ 29–30.) Defendants move for summary judgment on FTI's claims on the basis of the contract language and the affirmative defenses of waiver and estoppel, and plaintiff cross-moves for summary judgment in its favor.

Defendants assert three counterclaims against FTI, all arising out of FTI's failure to promptly pay Datasmith's invoice and travel expenses, and its charging the plane ticket to Smith's credit card. First, defendants seek compensatory damages based on FTI's alleged breach of Paragraph 2 of the Agreement, which provides that FTI must pay Datasmith on a monthly basis. Second, defendants allege that FTI violated the New York Labor Law by withholding their wages, entitling them to liquidated damages under section 198 of the Labor Law. Third, defendants assert a claim for conversion, based on FTI's charging the plane ticket to Smith's credit card and its refusal to reimburse him for travel expenses, for which they seek both compensatory and punitive damages. (Defs. Mem. at 20–26.) Plaintiff moves for summary judgment on all three counterclaims, and defendants cross-move for summary judgment on the contract and Labor Law counterclaims, and oppose FTI's motion for summary judgment on the conversion counterclaim.

## II. *Summary Judgment Standard*

When adjudicating a motion for summary judgment, a court must resolve all ambiguities in favor of the nonmoving party, although "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the opposing party " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto,* 143 F.3d at 114 (quoting *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient: there must be evidence on which the jury could reasonably find for the [non-movant]." *Pocchia v. NYNEX Corp.,* 81 F.3d 275, 277

tion. FTI's Paragraph 10 arguments in its brief are built on the assumption that FTI owns the Product under Paragraph 10 (Pl. Mem. at 15 & n. 7), and its companion trade secret claim is similarly premised. (*Id.* at 15 & n. 8.)

(2d Cir.1996) (quoting *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505).

## III. *FTI's Contract Claims*

■ Both FTI and defendants assert that the Agreement's language is completely unambiguous, but the opposing sides have drastically different readings of both Paragraph 7 and Paragraph 10. For the purposes of a summary judgment motion, the Court must decide whether significant contractual ambiguity exists. *Echelon Int'l Corp. v. America West Airlines*, 85 F.Supp.2d 313, 317 (S.D.N.Y.2000) (citing *Giles v. City of New York*, 41 F.Supp.2d 308, 318 (S.D.N.Y.1999)). If the language of the contract is "unambiguous and conveys a definite meaning," then the interpretation of the contract is a question of law for the court. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 629 (2d Cir.1995) (citations omitted). If the terms are not clear, the interpretation of the contract becomes a question of fact for the jury and extrinsic evidence of the parties' intent is admissible. *Id.* Further, a court may not draw any inference or give any construction to the terms of a written contract that conflicts with the clearly expressed language of the written agreement. *See, e.g.*, *General Elec. v. Compagnie Euralair*, 945 F.Supp. 527, 529 (S.D.N.Y.1996) (citation omitted). Because the Court finds that Paragraphs 7 and 10 are ambiguous, and that issues of fact will have to be resolved in order to interpret the Agreement, both parties' motions for summary judgment on FTI's contract claims are denied.

### A. *Breach of Paragraph 7*

As noted above, Paragraph 7 provides that "all information, reports, studies, object or source code, flow charts, diagrams and other tangible or intangible material ... produced by or as a result of any of the Services ... shall be the sole and exclusive property of FTI...." (Agreement ¶ 7.) Such materials are to be deemed "works for hire," presumably within the meaning of the Copyright Act's work for hire provision, 17 U.S.C. § 201(b) (2000), or, if they are not works for hire, irrevocably assigned to FTI. (Agreement ¶ 7.) In addition, all items "which qualify as FTI property" are to be marked as copyrighted by FTI. (*Id.*) Defendants contend that this language, taken as a whole, indicates that FTI owns only work product that would be copyrightable, and that since the Product was just an idea or an intangible process when Smith left FTI's employment, it was not copyrightable and therefore not covered by Paragraph 7. (Defs. Mem. at 1–2.) FTI, for its part, argues that Paragraph 7 covers all possible intellectual property produced by its employees, and therefore applies to the Product no matter what its status under copyright law. (Pl. Reply at 5.) Determining the scope of this provision requires interpreting the two elements of the Paragraph's operative sentence: "all information ... and other tangible and intangible material" and "produced by or as a result of any of the Services."

The phrase "all information ... and other tangible and intangible material" almost certainly encompasses more than just copyrightable works. To be copyrightable, works must be "fixed in any tangible medium," 17 U.S.C. § 102 (2000), and the Paragraph specifically includes "intangible material" in its coverage.[3] In addition,

---

3. The fact that Paragraph 7 requires copyright notices to be placed on "items provided to FTI which qualify as FTI property," (Agreement ¶ 7), does not necessarily indicate that the provision contemplates only copyrightable material. A copyright notice can be placed on a work without registering it with the Copyright Office, before the work has been found to be copyrightable. *See* 17 U.S.C. § 401(a) (2000). In addition, the notice pro-

"information" is generally not copyrightable, *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), but information is within the scope of the Paragraph. Beyond this basic point, however, it is not clear just how much intellectual property is covered by Paragraph 7, or whether ideas or concepts fall within the meaning of "intangible materials."

■ The requirement that the covered materials have been produced "by or as a result of any of the Services" is also ambiguous. While defendants assert that the clause as a whole means that FTI must have specifically assigned Smith to create the Product in order to assert ownership, this narrow coverage is provided by the requirement that the materials have been produced *"by . . . any of the Services."* The phrase "as a result of . . . Services" must therefore have a broader meaning than merely the products of specific work assignments. *See Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993) (stating that provisions in contract should be read so as not to make any one of them superfluous). On the other hand, the meaning must be narrower than any products that would not have been produced "but for" Smith's employment at FTI, since such an interpretation would encompass any works whose creation was caused, in some remote way, by Smith's employment at FTI, but that have no actual relation to the substance of Smith's employment.

■ Because the meaning and scope of Paragraph 7 are ambiguous, extrinsic evidence is admissible to show the parties' intent. *Bourne*, 68 F.3d at 629. The parties have proffered large amounts of conflicting evidence, and so resolving the

question of the scope of Paragraph 7 will require inferences and credibility determinations that must be made by a factfinder at trial. *Id.* For instance, defendants have proffered the agreement between Smith and FTI that governed an earlier course of employment, in 1992, and two agreements with other consultants, all of which contain language that specifically refers to rights in patents, inventions, and data. (Smith Decl. Ex. 3; Paparella Letter of 9/24/02, Attachs. 2, 3.) Whether the difference in the wording of the various contracts indicates an intent to narrow the scope of Paragraph 7 in the FTI–Datasmith Agreement, or whether all of the agreements cover the same types of intellectual property, as FTI asserts, is an issue of fact. In addition, the conduct of FTI officers in response to Smith's presentation of his proposal for the Product may be probative of how FTI interpreted the Agreement at the time. Defendants assert that, between March and July 1999, none of his supervisors at FTI ever stated that FTI might consider itself the owner of the Product. (Defs. Mem. at 17.) While FTI's officers were unable to remember clearly the conversations that they had with Smith about the Product, if Smith's testimony is credited, a factfinder could conclude that FTI's officers viewed Paragraph 7 as narrow enough not to include the Product.

Apart from the ambiguities as to the scope of Paragraph 7, the parties dispute the manner and extent of the Product's development during Smith's employment with FTI. Resolution of these issues is necessary because they are probative of the parties' understanding of the scope of the Paragraph, as well as of whether the Product falls within its coverage. The

---

vision could be more narrow than Paragraph 7's coverage, since the word "items" suggests tangibility, and thus may or may not include

"intangible materials." This ambiguity in the Paragraph's language will need to be resolved at trial.

parties disagree as to the nature of Smith's day-to-day responsibilities for FTI, including his exposure to streetdata as a consultant (Smith Decl. ¶ 37; Pl. R. 56.1 Statement ¶ 6), and the degree to which he was involved in programming and improving streetdata (Smith Decl. ¶ 42; Lehman Dep. at 62–63; Pl. Mem. at 7). The extent to which Smith had developed the Product into a working prototype by the time he was fired is also in dispute (Smith Decl. ¶¶ 88–89; Pl. Mem. at 8; Vogel Decl. at 19), and the exact nature of the Product is unclear. These disputed issues of fact are material to the determination of whether the Product is owned by FTI under Paragraph 7.

Notwithstanding the issues of fact involved in interpreting Paragraph 7 and its application to the Product, defendants argue that they are entitled to summary judgment because FTI waived its right to assert that it owns the Product, or is estopped from doing so.[4] Both defenses are based on the conduct of FTI officers Reinhardt and Lehman in response to Smith's presentation of his proposal in March 1999. (Defs. Mem. at 17.) Smith alleges that both officers failed to assert FTI's rights to the Product, encouraged him to further develop it, and claimed ownership only after Smith presented the more detailed proposal in July 1999. (Smith Decl. ¶¶ 62–64.) Both these defenses fail as a matter of law.

■ Defendants may not assert that FTI waived its right to assert ownership under Paragraph 7, because Paragraph 23.3 provides that "[f]ailure by either party ... to require performance by the other party or to claim a breach of any term of this Agreement will not be construed as a waiver of any right under this Agreement." (Agreement ¶ 23.3.) Under New York law, where an agreement contains a no-waiver provision such as this one, "a party's failure to insist upon strict compliance is not considered a waiver of his right to demand exact compliance."[5] *Subaru Distrib. Corp. v. Subaru of Am., Inc.*, No. 98 Civ. 5566(CM), 2002 WL 413808, at *16 (S.D.N.Y. Mar. 18, 2002); *DeCapua v. Dine–A–Mate, Inc.*, 292 A.D.2d 489, 744 N.Y.S.2d 417, 420 (2d Dep't 2002). Thus, even if FTI's senior management failed to immediately assert that FTI would own whatever Smith eventually developed, FTI did not waive the protection of Paragraph 7.

■ Nor may defendants avail themselves of the defense of estoppel. To establish that FTI is estopped from asserting its ownership of the Product, defendants must show that FTI made false representations or concealed facts with knowledge of the falsehoods and in the expectation that defendants would rely on them; that defendants were ignorant

---

4. While defendants state that their affirmative defenses of waiver and estoppel apply to "FTI's claims," without distinguishing between them (Defs. Mem. at 17), the Court will treat the defenses as applying only to FTI's contract claim based on Paragraph 7. Defendants did not respond to FTI's claim that they breached Paragraph 10 (Pl. Reply at 4 n. 7), and the factual premise of the affirmative defenses is that FTI's officers failed to assert FTI's potential ownership of the Product, not that they failed to accuse Smith of misappropriating FTI's information or breaching its confidentiality. (Defs. Mem. at 17–18.)

5. While FTI relies on Paragraph 23.2, a provision forbidding oral modifications or waiver, Paragraph 23.3 also applies, and is broader in scope than Paragraph 23.2. While "no oral waiver" clauses may sometimes be waived by a subsequent course of conduct, *Christian Dior–New York v. Koret, Inc.*, 792 F.2d 34, 39–40 (2d Cir.1986), provisions like Paragraph 23.3., guarding against waiver of rights not immediately asserted, are not waivable through conduct. *DeCapua v. Dine–A–Mate, Inc.*, 292 A.D.2d 489, 744 N.Y.S.2d 417, 420 (2d Dep't 2002).

of the true facts; and that defendants detrimentally relied on the representations. *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 301–02 (2d Cir.1996). Defendants' claim of estoppel depends on Smith's purported reliance on FTI's alleged failure to claim ownership, which led him to develop the Product while still employed at FTI. (Smith Decl. ¶ 66.) Smith clearly was not ignorant of Paragraph 7's potential application or of the possibility of an ownership dispute, however, even after Reinhardt and Lehman allegedly had failed to invoke Paragraph 7. In Smith's July proposal, he wrote that one of his goals was "to obtain FTI's agreement that this Datasmith effort may not be copyrighted by FTI as 'works made for hire' as defined in [Paragraph] 7...." (*Id.* Ex. 11.) Smith also testified in his deposition that his July proposal was meant as the starting point for negotiations to "modify" Paragraph 7 to ensure that it would not apply to the Product. (Smith Dep. at 192–94.) Because Smith was not misled by FTI's alleged failure to assert ownership, he cannot show ignorance of the true facts or detrimental reliance, and thus defendants have no grounds to assert estoppel.

### B. *Breach of Paragraph 10*

FTI also argues that defendants breached Paragraph 10 of the Agreement, which provided that Datasmith must refrain from disclosing or using for its own purposes any of FTI's "information which has commercial value in its business and which is not in the public domain," and obligated Datasmith to enter into confidentiality agreements with its employees that designated FTI a third-party beneficiary of those contracts. (Agreement ¶ 10.) FTI alleges that defendants used the GFDM (and possibly other FTI products, such as streetdata) to develop the Product, and that, assuming that FTI owns the Product under Paragraph 7, defendants' continuing exploitation of the Product is a violation of Paragraph 10. (Pl. Mem. at 2, 15.)

■ As a preliminary matter, FTI argues that Smith is personally bound under Paragraph 10, even though only Datasmith was a party to the Agreement. (*Id.* at 15 n. 8.) Had Datasmith and Smith actually signed a confidentiality agreement that named FTI as a third-party beneficiary, FTI could enforce Smith's duty to Datasmith to keep FTI's information confidential. *See, e.g., Key Int'l Mfg., Inc. v. Morse/Diesel, Inc.,* 142 A.D.2d 448, 536 N.Y.S.2d 792, 796–97 (2d Dep't 1988). Since the Datasmith–Smith confidentiality agreement was never created (Smith Dep. at 156–60),[6] however, there is no Datasmith–Smith contract for FTI to enforce.[7]

■ Notwithstanding the lack of a Datasmith–Smith contract, Smith may be equitably estopped from relying on Datasmith's breach to escape being bound by Paragraph 10. *See Readco,* 81 F.3d at 301–02. Smith's beginning work at FTI, after having signed the Agreement, constituted a representation that he, as Datasmith's only officer and employee, had caused Datasmith to comply with Paragraph 10. *Id.* (stating that conduct can

---

**6.** Defendants do not dispute that a Datasmith–Smith agreement was never created, or that this constituted a breach of Paragraph 10. (Defs. Mem. at 13–14.)

**7.** As a Datasmith employee, Smith has a duty to Datasmith not to divulge any confidential information received as a result of his employment. This duty arises independently of contract, *Kaufman v. IBM,* 97 A.D.2d 925, 470 N.Y.S.2d 720, 723 (3d Dep't 1983), but since Smith's fiduciary duty does not run to FTI, it is not clear that FTI would have standing to enforce it.

amount to a false representation of existing material fact). As the person who signed the Agreement on Datasmith's behalf, Smith had knowledge of Datasmith's obligations under Paragraph 10 (Smith Dep. at 158), and of the fact that he was the only person who could ensure that Datasmith complied with the Agreement. Despite his awareness of Datasmith's obligation, however, he never created the required confidentiality agreement, thus causing Datasmith to breach Paragraph 10. (*Id.*) A factfinder could determine that Smith expected that FTI would act upon his conduct, since FTI's inclusion of Paragraph 10 in the Agreement evidently indicated that it considered a promise of nondisclosure to be a prerequisite to employing him as a consultant. *See Sterling v. Interlake Indus., Inc.*, 154 F.R.D. 579, 585 (E.D.N.Y.1994) (requiring only that the party being estopped had reason to believe that its acts might prejudice the relying party). FTI may have been unaware that Smith had neglected to create the confidentiality agreement, and may have relied on Smith's representation to its detriment, since it did allow Smith access to confidential information (Smith Dep. at 160), and he may have used that information for his own purposes. (Pl. Mem. at 15.) These material issues of fact as to whether Smith is bound under Paragraph 10 under an equitable estoppel theory will have to be resolved at trial.[8]

▮ FTI bases its claim against Datasmith (and possibly Smith) under Paragraph 10 on two theories: that defendants used FTI's proprietary information (the GFDM) in developing the Product, and that defendants continue to use FTI's information by marketing the Product. (Pl. Mem. at 1–2.) Once again, the meaning of the Agreement is ambiguous: FTI argues that the GFDM is "information which has commercial value in [FTI's] business and which is not in the public domain" (*id.* at 15), while defendants assert that because FTI allegedly did not go to great lengths to keep the GFDM secret, it could not have been information "not in the public domain." (Defs. R. 56.1 Statement ¶ 45.) The scope of Paragraph 10's protection is ambiguous, since "public domain" is a copyright term, but the Paragraph clearly applies to more than

---

**8.** Generally, estoppel may not be used to create rights where they do not already exist, but simply to prevent a party from enforcing rights "which would result in a fraud or injustice." *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F.Supp. 1087, 1098 (S.D.N.Y. 1988); *see also Readco*, 81 F.3d at 301. Here, Smith, if estopped, would simply be prevented from denying FTI the rights that it should have had, since the only reason that FTI cannot assert its rights as a third-party beneficiary of a Smith–Datasmith agreement is Datasmith's breach of the Agreement, for which Smith is solely responsible. In addition, while courts generally will not use estoppel to create contracts, *Ayer v. Bd. of Educ. of Central School Dist. No. 1*, 69 Misc.2d 696, 330 N.Y.S.2d 465, 468–69 (1972), estoppel may be used to prevent a party from denying the existence of a contract where the material terms of the contract have been agreed upon. *See, e.g., Gleason v. Tompkins*, 84 Misc.2d 174, 375 N.Y.S.2d 247, 254 (1975) (holding, where terms of lease had been agreed upon by two parties, a nonparty co-tenant could be estopped from denying the existence of the lease, and that estoppel could "create a real property contract"). Here, the effect of estoppel would simply be to allow FTI to assert a claim under Paragraph 10 against Smith as well as against Datasmith, using the terms provided by Paragraph 10. Datasmith was to "enter into written agreements to comply with the provisions of this Section," and the agreements were to provide that Datasmith's employees would not "disclose or use such [proprietary] information for any purpose other than their performance of the Services," and would "name FTI as a third party beneficiary." (Agreement ¶ 10.) Thus, a finding of estoppel against Smith would not require the Court to craft an agreement or create material terms that the parties did not contemplate.

just copyrightable material.[9] Thus, it is not clear whether protection under Paragraph 10 requires trade secret-like protective measures, or if all information and works in which FTI claims intellectual property rights (whether patent, copyright, or trade secret) would be covered. *Cf. Earthweb, Inc. v. Schlack*, 205 F.3d 1322, 2000 WL 232057 (2d Cir.2000) (describing contract that protected both trade secrets and confidential information, and included detailed definition of what constituted confidential information). Thus, extrinsic evidence, including evidence of the extent of FTI's protection of its information, will be necessary to resolve the ambiguity.

In addition, even assuming that the GFDM and streetdata would be protected under Paragraph 10, disputed issues of fact exist as to the extent of Smith's access to them, and whether or not he used them to create the Product. Smith states that the GFDM was contained in a book that was available to everyone, but that he did not have access to streetdata because he was not a programmer. (Smith Decl. ¶¶ 45–47.) FTI points out that Smith did his work on the Product on an FTI computer (Pl. Mem. at 8; Agreement ¶ 14), presumably the same one on which he performed his assignments relating to streetdata, which could suggest that he did have access to the products at issue. In addition, it is unclear whether Smith actually used the GFDM or streetdata to create the Product, or whether he simply used his generalized knowledge of FTI's products. *See Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 150 (2d Cir.1996) (holding that employees are not required to avoid using knowledge gained as a result of employment on their personal projects). The parties also dispute whether or not the July proposal evidences Smith's reliance on the GFDM. (Pl. Mem. at 11; Smith Decl. ¶ 89 & Ex. 11.) It is impossible to resolve these contentions or to determine the extent to which Smith used the GFDM without a more concrete idea of what exactly the GFDM, streetdata, and the Product do, and what their component parts are. None of the parties has provided that, and so resolution of this breach of contract claim will require a trial.

## IV. *FTI's Misappropriation of Trade Secrets Claim*

 FTI's misappropriation of trade secrets claim is based on similar factual theories as its claim for breach of Paragraph 10: that defendants used the GFDM, FTI's trade secret, in developing the Product; and that the Product therefore is now FTI's trade secret as well.[10] (Pl. Reply at 10–11.) To successfully allege misappropriation of trade secrets, plaintiff must prove that (1) it possessed a trade secret; and (2) that defendants used or continue to use that trade secret "in breach of an agreement, confidence, or duty, or as a result of discovery by im-

---

**9.** Paragraph 10 covers "information," and, as noted above, information itself is generally not copyrightable.

**10.** Defendants argue that this claim is nothing more than a duplication of plaintiff's contract claims (Defs. Mem. at 14–15), but this is not the case. Claims for breach of nondisclosure agreements and misappropriation of trade secrets often coexist, because the duty not to disclose an employer's trade secrets can arise independently of any contractual duties that the employer or contractor might assume, or can be found in the nondisclosure agreement that the defendant has breached. *See, e.g., Kaufman*, 470 N.Y.S.2d at 723; *Cornibert v. Cohn*, 169 Misc. 285, 7 N.Y.S.2d 351, 353–54 (1938) (finding that employees of printer had duty to printer's client not to disclose client's secrets learned as a result of employment, despite the lack of a contract between the client and the employees).

proper means." *Integrated Cash Mgmt. Services, Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir.1990) (citations omitted). Because the determination of whether the GFDM and the Product are trade secrets, and if so, whether defendants appropriated them, is a highly fact-specific inquiry, both sides' motions for summary judgment on this claim must be denied.

At the outset, defendants argue that FTI may not maintain its claim against Smith because FTI cannot show that Smith had a duty to FTI, as required to fulfill the second element of the misappropriation claim, *Integrated Cash Mgmt. Services,* 920 F.2d at 173, since he was not a party to the Agreement. (Defs. Mem. at 15.) As noted above, however, Smith may be estopped from denying that he was bound under Paragraph 10, and this would give him a duty to FTI under the Agreement. Even in the absence of estoppel, Smith had a duty, arising independently of the Agreement, not to use information gained from FTI as a result of his employment with Datasmith. Employees have a fiduciary duty to their employer not to disclose or use confidential information gained as a result of their employment. *North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 47–48 (2d Cir.1999). Smith was therefore obligated to Datasmith not to use any information—even that of FTI, with whom he had no contractual relationship—gained through his employment. Datasmith in turn was bound by Paragraph 10 of the Agreement not to use (or allow its employees to use) FTI's information for anything other than FTI's purposes. This relationship between the three parties is sufficient to create a duty in Smith not to use FTI's trade secrets. *See Cornibert v. Cohn,* 169 Misc. 285, 7 N.Y.S.2d 351, 353–54 (1938) (finding that employees of printer had duty to printer's client not to disclose client's trade secrets

learned as a result of their employment with the printer). Moreover, Smith acknowledged in his deposition that he thought that he was bound not to use or ·disclose FTI's trade secrets (Smith Dep. at 158), and FTI considered him bound as well. (Pl. R. 56.1 Statement ¶ 34.) Thus, FTI may maintain its claim against Smith as well as against Datasmith.

■ Regarding the first element of the misappropriation claim, it is impossible to determine whether or not the GFDM is a trade secret without more details as to what it is. Deciding whether a trade secret exists involves consideration of the extent to which the information is known outside of the business and within the industry; the extent of measures taken to guard the secrecy of the information; the effort expended in developing the information; and the ease with which the information can be duplicated or properly acquired by others. *Integrated Cash Mgmt. Services,* 920 F.2d at 173. In order to examine these factors, the Court must know exactly what aspects of the GFDM are allegedly trade secrets, yet the parties have provided almost no detail as to the GFDM's nature and composition. Plaintiff describes the GFDM as a "complex organizational structure and coordinated set of rules" for mapping financial data into databases (Pl. Mem. at 6), but does not elaborate on the purportedly confidential components, or structure, of the product. Possibilities include the rules for categorizing data, the ways in which the rules are prioritized within the databases, the translation of the GFDM into the streetdata software, or the overall architecture of the system. *See Integrated Cash Mgmt. Services,* at 174. Without a more concrete understanding of the allegedly secret elements of the GFDM, it is impossible for the Court to consider the other factors in the trade secret analysis, such as the ex-

tent to which the elements may be inferred or reverse-engineered by FTI's clients, the degree of protection accorded the secrets by FTI, and the industry practice with regard to database systems with comparable components. Thus, the issues of fact surrounding the trade secret determination will have to be resolved at trial.

The success of FTI's second misappropriation theory, that the Product is a trade secret belonging to FTI and the defendants continue to exploit it, also depends on significant questions of fact. As a prerequisite, FTI must prevail on its contractual claim that it is the owner of the Product. In addition, determining whether the Product is a trade secret will require the same fact-specific analysis as for the GFDM, and none of the parties has provided the Court with specifics as to what the Product is, what it is composed of, whether reverse engineering is possible or likely, and how it compares to existing products in the industry.

Accordingly, the cross-motions for summary judgment on plaintiff's misappropriation of trade secrets claim are denied.

## V. *Defendants' Breach of Contract Counterclaim*

■ Defendants allege that FTI breached the Agreement when it refused to pay Datasmith's August 1999 invoice and reimburse Smith for his travel expenses. Paragraph 2 of the Agreement provided that FTI would pay Datasmith for services rendered on a monthly basis. (Agreement ¶ 2.) Therefore, FTI's failure to pay the invoice until eight months after it was submitted constitutes a breach of Paragraph 2, unless FTI's performance was excused.

FTI argues that defendants had committed a material breach of Paragraphs 7 and 10 of the Agreement, and that it therefore had a right to withhold the $16,402.58

owed to Datasmith under the contract. *Frank Felix Assocs. v. Austin Drugs, Inc.,* 111 F.3d 284, 289 (2d Cir.1997) (stating that performance is excused if other party's breach defeats the object of the agreement). Whether a breach is material or not is a question of law, *id.,* but whether a breach has occurred at all depends, in this case, on disputed questions of fact. Since, as noted above, the determination of whether defendants breached any part of the Agreement cannot be made on a summary judgment motion, whether defendants committed a material breach also cannot be determined without a trial.

■ FTI also contends that defendants' breach of contract claim is mooted because FTI eventually paid the disputed invoice in full, and reimbursed Smith for his travel expenses. (Pl. Mem. at 16; Smith Decl. Ex. 23.) Because FTI did not pay defendants until eight months after the invoice was due, however, FTI may owe defendants interest on the $16,402.58. While the amount of interest allegedly due may turn out to be inconsequential. it is enough to keep defendants' claim from being mooted.

## VI. *Defendants' New York Labor Law Counterclaim*

Defendants allege that FTI violated the New York Labor Law, Article 6, by withholding the $12,000 that FTI owed Datasmith for Smith's work in July 1999. While defendants do not clearly specify which substantive provision of the Labor Law FTI has allegedly violated, simply stating that they are entitled to the liquidated damages remedy of section 198, presumably their claim is under section 193, which forbids employers from making deductions from wages. N.Y. Lab. Law § 193 (McKinney 2002). Defendants argue that both Smith and Datasmith were FTI's employees (despite Smith's insistence, in re-

sponse to FTI's contract claims, that he cannot be bound by the Agreement because he was not FTI's employee), so that both are individually entitled to bring Labor Law claims against FTI. (Defs. Mem. at 23.) Both claims fail under the text of the statute.

 To state a claim under Article 6, defendants must allege that their wages were withheld in violation of one of the substantive provisions of the Labor Law. *Alter v. Bogoricin,* No. 97 Civ. 662(MBM), 1997 WL 691332, at *13 (S.D.N.Y. Nov. 6, 1997). Section 190 defines "wages" as the "earnings of an employee for labor or services rendered," N.Y. Lab. Law § 190(1) (McKinney 2002), and defines "employee" as "any *person* employed for hire." *Id.* § 190(2) (emphasis added). The term "person" in the definition of "employee" does not include corporations, as indicated by the fact that the definition of "employer" includes "any person [or] corporation," *id.* § 190(3), and any other construction would render this mention of corporations superfluous. *See United States v. Anderson,* 15 F.3d 278, 283 (2d Cir.1994). Thus, Datasmith cannot maintain an action on its own behalf under the Labor Law.

 As for Smith, FTI's contractual relationship was with Datasmith only, and Smith's salary was in turn to be paid by Datasmith. Accordingly, any claim by Smith to payment from FTI must rely on Datasmith's contractual right to the payments. Since Datasmith cannot be an employee of FTI under the statute, the payments made by FTI to Datasmith cannot be wages within the meaning of § 190(1). Thus, Smith's claim is not for wages, but for payments due to Datasmith under the contract. The remedies of section 198 may not be invoked when the claim is in substance a contract claim to enforce the payment of obligations other than statutory wages, *Gottlieb v. Kenneth D. Laub &*

*Co.,* 82 N.Y.2d 457, 462–63, 605 N.Y.S.2d 213, 626 N.E.2d 29 (1993), and so FTI is entitled to summary judgment on defendants' Labor Law claim.

## VII. *Defendants' Conversion Counterclaim*

 Defendants assert a claim for conversion based on FTI's charging Smith's plane ticket ($3664) to his personal credit card. This claim fails as a matter of law, since conversion claims may be based on money only if the plaintiff has a right to immediate possession of a specific, identifiable amount. *Ehrlich v. Howe,* 848 F.Supp. 482, 492 (S.D.N.Y.1994). Paragraph 2 of the Agreement provided that Datasmith would be reimbursed for expenses incurred on FTI's behalf, so FTI had the right to charge Smith's credit card and reimburse him later. In addition, Smith gave FTI's travel agent authorization to charge plane tickets to his credit card. (Smith Dep. at 163–64.) While Smith argues that FTI's customary practice was to pay its employees' travel expenses itself, up front, rather than requiring employees to pay and be reimbursed (Smith Decl. ¶¶ 74–82), the Agreement and Smith's authorization provide the background rules of the parties' relationship, and establish that Smith had no right to protest a change in FTI's practice, and no right to immediate possession of the $3664. Therefore, plaintiff's motion for summary judgment on the conversion counterclaim is granted.

## CONCLUSION

For the reasons set forth above, the cross-motions for summary judgment are denied with respect to plaintiff's claims and defendants' breach of contract counterclaim. Plaintiff's motion for summary judgment on defendants' conversion and Labor Law counterclaims is granted.

414

In accordance with the Court's Individual Practices in Civil Cases, a joint pretrial order is due within 30 days of the filing of this opinion, unless the parties notify chambers within that period that they agree that the case should be referred for mediation or for a settlement conference before a magistrate judge.

SO ORDERED.